## Frank Webb v. The State.

1. CHANGE OF VENUE. — Only one change of the venue is allowable at the instance of a defendant.

2. SAME. — The Code of Procedure, art. 577, authorizes a district or county attorney to obtain a change of venue in a felony case on account of certain specified causes; and art. 579 provides for a change of the venue when an effort has once been unsuccessfully made in the county to obtain a jury in a felony case, and it seems likely that no jury can there be had. But in the proceedings authorized by these articles the requirements of the statute must be strictly complied with.

3. SAME. — If a district judge is satisfied that from any cause a fair and impartial trial of a felony case cannot be had in the county, he may and should, as empowered by art. 576, change the venue, of his own motion, to any county of his own or an adjoining district.

4. INSANITY — EVIDENCE — MEDICAL EXPERTS, if they have heard the whole of the evidence involved, or if the whole of the evidence has been hypothetically submitted to them, may be allowed to state their opinion thereon in respect of the insanity of the defendant at the time in question; but they cannot be allowed to predicate an opinion upon anything less than the entire evidence, whether actually or hypothetically presented.

5. SAME — PRACTICE. — The proper inquiry of the expert is, in substance, whether, assuming the truth of the symptoms and indications in proof, the defendant was, in the witness's opinion, insane.

6. NEW TRIAL. — SURPRISE by unexpected testimony is not a ground for new trial, but, although it arises after the commencement of the trial, may entitle to a continuance of the cause or a postponement of the trial.

7. SAME. — In a trial for murder, an expert witness for the defence testified contrary to expectation, but, instead of supplying the proof by other witnesses, or asking a continuance or postponement, the defendant, after conviction, assigned the surprise as cause for a new trial. *Held,* that the

trial court committed no error in overruling the surprise as cause for new trial.

8. SANITY — REASONABLE DOUBT. — The doctrine of reasonable doubt was charged upon the general issue of guilt, but the trial court refused to instruct for acquittal if there was a reasonable doubt of the defendant's sanity when he shot the deceased. *Held*, correct (HURT, J., dissenting). Consult the opinion of the court for a full exposition of this ruling, and for the dissenting views of Justice HURT see *King* v. *The State, post*, p. 515.

9. INSANITY — VERDICT — EVIDENCE. — The Code of Procedure,. art. 722, enacts that, " when the defendant is acquitted upon the ground of insanity, the jury shall so state in their verdict." To warrant such a verdict, the evidence of insanity should be sufficiently clear to convince the minds and consciences of the jury.

APPEAL from the District Court of Fort Bend. Tried below before the Hon. W. H. BURKHART.

The indictment charged the appellant with the murder of Charles R. Foster, in Galveston County, on September 2, 1876. The venue was first changed to Brazoria County, at the instance of the defendant. At a trial there a conviction was had for murder in the second degree, with forty years in the penitentiary assessed as the punishment. That conviction was set aside by this court, on appeal, for reasons disclosed in 5 Texas Ct. App. 596. On the remand of the case the venue was changed by the court, of its own motion, to Fort Bend County, where, in May, 1880, a second trial resulted in a verdict which again found the appellant guilty of murder in the second degree, but assessed his punishment at only five years in the penitentiary.

Robert Vanderpool, State's witness, testified that he resided in the city and county of Galveston on the second day of September, 1876, and on that day was at Charles R. Foster's cattle-pen, situated in the same city and county. At about a quarter before nine o'clock on that day, the defendant came there and stayed some ten or fifteen minutes. Foster was in his office at first, but started towards the pen when Mr. Paul Bazzi came. The defendant called to him, and Foster answered that he had no time to see him then,

but would see him as soon as he was through with Bazzi. The defendant then told Foster that he (Foster) had " done him dirt." Foster answered that he had not, and then the defendant shot him. After the defendant had shot, Mr. Norman came down and asked defendant what he had done, and defendant answered that he had given Foster fourteen days to come to a settlement, and he had not settled. There were three shots in the body. After the first fire, Foster asked the defendant not to kill him. The defendant had formerly been a salesman for Borden. The witness saw nothing strange in defendant's appearance. Paul Bazzi ran and jumped on the fence, and the witness also got on the fence, though he was not excited. His attention was not particularly called to the appearance of the defendant when he came to the pen. Foster died instantly. The witness saw the body after death, and identified it as that of Charles R. Foster. He was killed by Frank Webb, the defendant, in Galveston County, State of Texas, on the second day of September, 1876, the date charged in the indictment.

James Giddings, State's witness, testified that he lived in Galveston County in September, 1876, and worked with cattle. He was present at the pen on the day that the deceased was killed. Mr. Paul Bazzi came to the pen that morning to buy some calves. The deceased was in the office when Mr. Bazzi came, but soon came out, went down towards the pen, and commenced trading with Mr. Bazzi. The defendant was then sitting down on the railroad track, but got up and went towards the deceased, telling him that "this had been going on long enough." He had his coat on his arm, from a pocket of which he drew a pistol and shot the deceased three times. The witness did not know whether the defendant said anything more to the deceased before the shooting. When Mr. Norman came out of the office, the defendant was at least one hundred and fifty or two hundred yards off, and not near enough for conversa-

tion.   The defendant had ample time to have got off on the train if he had desired.   This is the same homicide testified to by Vanderpool.

A. P. Norman testified, for the State, that he was sitting in Charles R. Foster's office, in Galveston County, on the second day of September, 1876, and while there heard the report of a pistol.   Looking out of the window, he saw the defendant standing over the body of the deceased.   Witness ran down to the pen, and in passing through the bars, met the defendant and asked him what he had done; to which he made no reply that the witness heard, and witness passed rapidly on.   In passing by the hotel, some days before, the witness stopped and had a short conversation with the defendant, in the course of which he told witness that the deceased had sold some cattle for him, and that they had not brought as much as they should, and that he thought he had been badly treated.   The deceased had garnisheed some of defendant's money in the hands of Bowman, at Houston, and defendant told witness that the money garnisheed was all that he had, and that the loss of it would ruin him.   The witness attempted to settle the difficulty between the parties, but did not succeed.   He (witness) came out of the office when the deceased was killed, and before the defendant left.   Mr. Davis was immediately behind the witness.   The witness saw nothing unusual about the defendant, either then or when he saw him later, at the inquest.

Paul Bazzi, for the State, testified that he saw the defendant kill the deceased at the stock-pen in Galveston County, on the second day of September, 1876.   Himself, Vanderpool, and Giddings were present, the witness being nearer the place of killing than either Vanderpool or Giddings.   He saw the defendant sitting on the side of the railroad track before the shooting began.   He had his coat on his left arm, and he got his pistol out of the pocket of this coat when he fired and killed the deceased.   The witness did not hear

either the deceased or the defendant say a word before the shooting; he did not run when the shooting commenced; he did not get on the fence while the shooting was going on, nor did Vanderpool; he did not see Davis there at all, and testified that there were only four present. He did not know how far off the defendant was when the witness Norman came out of the office. This witness testified through an interpreter, and, as did all others who testified with regard to the homicide, knew the defendant, Frank Webb, and identified him in court.

William Latt testified, for the State, that at the time of the shooting he was clerk in Labadie's ammunition-store. On the morning of the shooting, between eight and nine o'clock, the defendant came into the store, bringing with him a Colt's forty-five-calibre six-shooter, and asked witness to load it, which witness did, and defendant paid the price — twenty-five cents. The defendant then put the pistol in the breast-pocket of his coat, and, throwing the coat over his left arm, walked off. Labadie's ammunition-store is about one and a half miles from the stock-pen where the shooting was done. The witness noticed nothing unusual in the defendant's manner; had no acquaintance with, but recognized the defendant as the same man.

Johnson Foster testified, for the State, that he had known the defendant since 1873. He met the defendant at Peter Bowman's, in Houston, some ten or twelve days before the shooting. The defendant told the witness on that occasion that "Charles R. Foster had better hunt his coffin before he tried to collect that debt." Witness and the defendant were both very angry. Here the State rested.

The witness Thompson testified, for the defence, that he saw the defendant in Houston one or two weeks before the killing. Witness was then deputy-sheriff of Harris County and deputy-marshal of Houston, and at the time had a writ for the arrest of defendant, with orders not to execute it, but to shadow him. The witness had known the defendant

intimately for several years, and saw him about Houston during two weeks before the killing, during which time his altered demeanor attracted witness's attention. On one occasion during this time witness was sitting in a room in a bawdy-house, when, unexpectedly, the defendant tore the window-blinds, sprang wildly into the room, and seized the witness violently by the throat. The witness struggled loose, and asked him what he meant. The defendant gazed about vacantly for a moment, laughed meaninglessly, and finally said, " Nothing." Defendant then asked the witness to take a drink. The defendant was not drunk. One night during the same two weeks, while witness was on duty on the streets, he noticed the defendant come out of a bar-room without hat or coat. He walked into the middle of the street, looked wildly up and down, and then reëntered the saloon. He repeated this performance ten or twelve times, when witness went out to him and asked what was the matter. The defendant did not seem to hear the witness, and made no reply to his question. Witness then followed him into the bar-room and asked Mr. Wells, the proprietor, if he had noticed the defendant's strange conduct. Wells said that he had, and asked what was the matter with him. The witness replied, " I believe Frank Webb is crazy," and Wells said, " I believe .so, too." This occurred on the night before the defendant left for Galveston. He was not drunk, but, in the opinion of the witness, was crazy or insane. The witness did not arrest him, because he was neither boisterous nor disorderly. Late at night the defendant went off up the street, as if going to bed, and witness did not follow him. Witness is now deputy-sheriff of Harris County, and is present in attendance upon the court under attachment.

J. D. Webb, a brother of the defendant, testified for the defence that his mother is now insane, having lucid intervals. His sister has charge of her household. His grandfather on the paternal side was insane, and committed suicide in a fit

of insanity, as did the granduncle of witness and the defendant. This is family tradition. The witness had a cousin on the maternal side who was insane, and who, about four years before, in Jackson County, in a fit of insanity, drowned herself. His age was about eighteen years. His sister has frequent attacks of illness, accompanied by cataleptic or epileptic fits, during which she becomes greatly excited, screaming and seeming in terror of something. The witness's father was very eccentric in some respects. He dressed quaintly, and expressed a desire to be buried in his boots, in a plain box, and attired in his curious costume. The witness had a brother buried on a hill-side, whose body his father often urged the witness to dig up and inter near the residence. His brother Frank, the defendant, left home two or three weeks before the killing. His manner during his last visit at home, prior to the killing, was strange and unnatural. He would retire into the woods alone, and mope in silence for hours at a time. From having been jovial, sociable, and neat in dress, he had become morose, moody, depressed, and careless in dress. The witness saw him in Galveston the night before the killing, in bed, at the hotel, asleep. It was a minute after he was aroused before he recognized the witness, nor did he at first recognize an old acquaintance who was with the witness. He at first gazed around vacantly, and failed to recognize the witness and his old friend for several minutes, and then only after several remarks had been made by them. The witness felt anxious about his condition, and urged him to go home with him, but he declined. He was wild and unnatural, and the witness noticed a marked change in him, both as to neatness of dress and personal appearance. The witness usually carried a pistol when driving cattle from Jackson County to market, to protect himself from robbers when returning home with money. The witness left it this time at the hotel until he should return from Houston, on his way home. The witness was a stock-man, and had cattle in Houston at that

time.   He exercised no control over his brother, the defend-
ant, who attended to his own business.   None of the wit-
ness's family, to his knowledge, had ever been sent to an
asylum.

Amos Haynes, cousin of the defendant on the paternal
side, corroborated the last witness as to the insanity of the
grandfather and granduncle of the defendant on the pater-
nal side, and as to the insanity and infirmity of defendant's
mother and her nephew.   He also testified that the defend-
ant came to buy cattle of him a few days before he went to
Houston, on the last trip.   His altered manner impressed
the witness at the time, and he declined to let him have the
cattle on credit, not fearing his honesty, but his ability.
The witness would have sold him cattle for cash.   The de-
fendant stayed at the house of witness's mother several days,
and witness remarked to her the change in defendant's man-
ner and appearance, and his peculiar actions.   He bought
some cattle from a man who was the agent of a packing
company which soon afterwards failed in business.   The
defendant's mother was a Catholic, not a spiritualist, and
one of her peculiarities, even in the presence of strangers,
was to converse with persons she deemed present, but who
in fact were absent; at which times, to all appearances, she
was oblivious of the persons near her.

James Cahill testified, for the defendant, that he was now
a special officer on the Galveston police force, but at the time
of the killing was a constable, and was in attendance that
day upon Justice Shields' court, then in session.   He was
out looking for a juror, when he saw the defendant, whom
he knew well, coming from towards the railroad depot.
Witness told him he was looking for a juror, and asked him
to serve.   He said, "All right," and passed into Carson's
saloon, where Peter Christman was.   Witness waited some
time for him, and then stepped to the door and asked him to
"come on."   He then told witness that he could not serve,
that he had had a difficulty with Foster, and asked witness

if he was an officer, saying that he wanted to give himself up.
He then started to tell witness about the difficulty, but wit-
ness stopped him, and the two went to the place where court
was being held.    This place was about a mile from the stock-
pen, and in a thinly settled portion of the city.    While talk-
ing to the witness the defendant had a wild look about him,
as if suffering from the effects of a spree.    The witness did
not then attach much importance to the defendant's state-
ment, but sent a messenger to the stock-pens to ascertain if
anything had happened.    The messenger returned in about
an hour and reported the killing of the deceased by the de-
fendant.    During the absence of this messenger, the defend-
ant sat in a room to himself, unguarded, and might easily
have escaped.    He was not drunk, and his manner was very
different from that of any one who had committed a homi-
cide ever seen by the witness before, and the witness had
been an officer in Galveston for fifteen years and had arrested
a great many criminals.    The manner of the defendant was
that of perfect indifference.    The justice and jurors started
to the stock-pens to hold an inquest, and the witness took
the defendant and went with them, the defendant preserving
throughout his manner of total indifference.    When the
party reached the stock-pens, witness turned the defendant
over to Frank Pool, also a constable.    The witness saw the
defendant a night or two before the killing, and noticed that
his eyes had a peculiar glare, and that his actions were very
peculiar.    He could easily have escaped if he had tried.    He
could have gone on the cars, which were about leaving for
Houston when witness first saw him.    He could have left
the court-room when he was unguarded, and escaped, if he
had tried.    When he first told witness that Foster was
killed, his manner was so indifferent that witness did not
believe him.    After the inquest the witness again assumed
control of the defendant, who still preserved his indifference,
and manifested no curiosity as to the result.    The witness
and defendant walked to the street-cars, and then rode to

the jail, taking four or five drinks on the way. At the jail he turned the defendant over to the jailer.

Frank Pool testified that at the time of the killing he was a constable in Galveston. He went down to the inquest, and, at the request of Cahill, took charge of the defendant while Cahill waited on the court. The defendant, during the time he was in charge of the witness, displayed a state of entire indifference. While they were waiting for the inquest to conclude, Capt. Borden or Mr. Hoskins passed, and asked the defendant, "Frank, what did you kill the old man for?" Defendant asked, "What man?" and being answered, "Foster," he replied, "Pshaw! you are just like the rest." His eyes glared, and he had a look so unearthly that the witness became alarmed, and was about to call for assistance, when Capt. Atkins appeared and told the witness to call Sergeant Flynn; but just then Cahill returned. The defendant asked no questions of Cahill or others as to the result of the inquest.

Peter Christman, for the defence, testified that at the time of the killing he was bar-tender at Carson's saloon, between the stock-pens and the main part of the city, and about one mile from the pens. Just as the cars were drawing out from the depot, the witness saw the defendant approaching the saloon from the direction of the pens. He came into the saloon, looking wild and nervous, and trembling like a man in a delirium. He threw his hat on the counter, and when witness asked him what was the matter, he told witness to take his coat and keep it. He then told witness to come into the back room with him, and followed up this request by telling him not to keep the coat, but to keep what was in the pocket, which was a partly discharged six-shooter. He then said that he had had trouble with Foster, and had hurt him badly. The witness asked him if he did it in self-defence, and he replied that he could not help doing it. He looked strange and wild, and called for a toddy, which witness gave him. He drank it and started to the door to

Cahill, who called him.   Witness called after him and asked if he should charge the drink, but he made no reply.   The witness had seen the defendant often during two years, but had not exchanged a dozen words with him.   His manner on this occasion seemed totally changed from what it had been.

Joe Wells, testifying for the defence, and referring to the testimony of Thompson, said that he remembered the defendant coming in and out of the bar-room every few minutes on the night spoken of, and thought him wild or funny. He had his hat on, but his coat off.   It was quite usual for stock-men to be in town with their coats off.

Ben Kiggins testified, for the defence, that he had known the defendant intimately for some years, and that before the killing he had noticed marked changes and peculiarities of manner, conduct, and appearance in him.   For two or three weeks previous to the killing the defendant had been in Houston, in " deep debauch."

Dr. C. H. Seeds, having heard the testimony, and upon a hypothetical basis, pronounced the defendant, in his opinion, insane at the time of the killing.

Dr. Gibson, medical expert, testified, for the defence, that he had heard all the evidence in this case, and was of opinion that the defendant's mind was deranged at the time of the killing, but he would not say from what cause.   He saw no evidence of mania in defendant's mental condition.   The defendant may have had a faint idea that what he is charged with doing was wrong, but could have no *clear*, *definite* idea that it was wrong.   Judging from what he would himself have done under the circumstances, he thought that defendant was crazy when he did the killing.   This witness testified identically as Dr. Seeds on the principles, symptoms, and evidences of insanity.

Dr. Stone, as a medical expert, testified that he had heard all the testimony, but, not being a juror, he asked to be excused from replying to the question whether or not the testi-

mony established in his mind the sanity or insanity of the defendant at the time of the killing ; and the court excused him.    He testified that he had heard no evidence of the insanity of the defendant that could not be explained by other causes, such as indulgence in drink or debauchery.    From the evidence of the witness Pool alone, he would not consider the defendant insane.    He believed that the mind of the defendant, at the time of the commission of this particular offence, was more or less distracted, from some cause, but not to an extent to relieve him entirely from responsibility.    This witness, it appears, was introduced by the defence, and his testimony was assigned as a cause for a new trial, on the ground of surprise.

The opinion of the court states all other facts germane to the rulings.

*Arthur P. Bagby*, for the appellant.    The opinion of experts, when it can be accurately and fully secured, is accepted by the law as a part of the settled facts from which its conclusions are drawn.    Whart. & Stille's Med. Jur. 293.    In this case there was no conflict of testimony as to the *indicia* of insanity recognized by medical science.    The court below charged the jury that the conclusions of medical science, as recognized by scientific men and testified to by experts, were part of the law of the case, but that the jury were to determine the weight to be attached to them — making the jury the judges of what is a matter of law.

If the jury, in a criminal cause, have a reasonable doubt of the sanity of a defendant who interposes the defence of insanity, they should acquit.    Our Penal Code, art. 39, provides that no act done in a state of insanity can be punished as an offence. . The Code of Criminal Procedure, art. 725, adopts the rules of evidence known to the common law, save where they conflict with a statutory provision.    Art. 727 declares that the defendant in a criminal case is presumed to be innocent until his guilt is established by legal

evidence, and in case of reasonable doubt he is entitled to be acquitted. To whatever exceptions the common-law rule may have been subject, about the language of the statute there can be no doubt. It is broad, comprehensive, and universal in its import. By it every exception to the rule which existed under the common law is repealed, for with it they are in conflict. It is submitted that the humanity of the age and the increase of scientific knowledge on psychological subjects have caused the extension of the same principle to cases of insanity, even by those whose decisions are controlled by the common law.

In *Westmoreland* v. *The State*, 49 Ga. 225 ; *Cole's Trial*, 7 Abb. Pr. (N. S.) 221, and *The People* v. *McCann*, 2 E. D. Smith, 58, it is distinctly announced that the doctrine of reasonable doubt applies as well to cases where the defence is insanity as to others. It is submitted that, in refusing to charge the law relating to the reasonable doubt as asked by the defendant, and in simply charging that the defence of insanity must be clearly established, the court below clearly violated the rights of the defendant. In its view of the law that court professes to have been controlled by the decision of this court in *Webb* v. *The State*, 5 Texas Ct. App. 596, but it is suggested that the purport and intendment of that decision were clearly misapprehended. In that case, in deciding upon the sufficiency of an application for a continuance, and in order to show that certain testimony was not cumulative, this court used an extract from Greenleaf on Evidence, in which it is said that the defence of insanity must be " clearly established." The object of this court, it is submitted, was merely to follow out, by appropriate and apposite quotation, the line of reasoning suggested by the question before it, and not to decide, as a side issue, a question as grave, and fraught with consequences as momentous, as any ever submitted to a tribunal of the last resort.

The subject of insanity has been involved in some obscu-

rity by the use of the phrase that, when it is pleaded as a defence, the " burden is shifted" from the State to the defendant; and from this expression the inference is drawn that the defendant must establish his defence by the same character and weight of evidence as is ordinarily required of the State to make out its case. Than this nothing can be more illogical. In law, every man is presumed to be sane. No " burden," so far as the sanity of a defendant is concerned, is imposed upon the State. When insanity is presented as a defence, a burden is imposed on him who presents it, and by every analogy that burden must be the one of destroying the presumption which the law raises against the defence. When that is done, — when a *prima facie* case of insanity is made out, — when the presumption of sanity is destroyed by raising in the minds of the jury a reasonable doubt of its existence, or, at most, when insanity is established by a preponderance of evidence, as a plaintiff in a civil action is required to establish his cause, the defendant's task is done and he is relieved of his burden.

Odious as this defence is regarded, it is one of those most rarely presented in courts of justice. To establish it, false evidence is practically impossible. All that is said against it would apply with tenfold force to that of self-defence, which is the ordinary city of refuge for the homicide, who rarely lacks sympathizers and accomplices by whom the facts of the case can be clouded and obscured so as to render the doctrine of reasonable doubt available in his behalf. To deny the benefit of the same doctrine to the insane would be to deprive the most helpless of God's creatures of a protection which is accorded to every other.

*W. B. Dunham*, for the State.

WHITE, P. J. Before the former appeal in this case defendant had, on motion, obtained a change of venue from

Galveston, where the crime was alleged to have been committed, to the County of Brazoria, where the former trial was had. After reversal of the judgment by this court, and when the case was again called for trial in the District Court of Brazoria County, the defendant made another motion for change of venue, and the prosecuting officer (but whether in writing, under the provisions of art. 577 of the Code of Criminal Procedure, does not appear) suggested that the venue be changed to the county of Harris. These motions were both overruled.

Under a plain construction of the statute (Code Cr. Proc., art. 578), but one change of venue can be had upon motion of the defendant. *Rothschild* v. *The State*, 7 Texas Ct. App. 519. See also *Ex parte Garst*, 2 Hawley's Am. Cr. Rep. 618. To be entitled to consideration, such a motion, coming from the county or district attorney, must be in writing, and in strict conformity with the provisions of art. 577 of the Code of Criminal Procedure, or in conformity with art. 579, where all reasonable means have been used, but unsuccessfully, to procure a jury for the trial. Having overruled these two motions, the district judge, of his own motion, changed the venue to the County of Fort Bend. This was not only no error, but was proper; since he had the authority, and it was his duty to do so, in case he was satisfied that a trial alike fair and impartial to the accused and the State could not from any cause be had in the county where the case was pending.. Code Cr. Proc., art. 576; *Cox et al.* v. *The State*, 8 Texas Ct. App. 254.

Two questions are submitted, by bills of exception, with reference to the expert testimony introduced on the trial. Dr. Stone, a medical expert, who was present and heard the testimony of the other witnesses, was introduced and examined by defendant upon the subject of insanity, the principal defence relied on. On his cross-examination he was asked by the prosecution: "From the testimony of Frank Pool, was the condition of defendant's mind such that he could

not distinguish right from wrong? '' to which he answered, over objection of defendant, "I do not think it was." Defendant asked that the answer be withdrawn from the consideration of the jury, which was also refused, the court stating that "the defendant might ask the doctor's opinion based upon the entire case, if he saw fit."

Mr. Wharton, in his work on Criminal Evidence, states the rule thus : " When insanity is set up by a defendant and denied by the prosecution, an expert cannot be asked his opinion as to the evidence in the case as rendered, not only because this puts the expert in the place of the jury, in determining as to the credibility of the facts in evidence, but because the assistance thus afforded is in most trials illusory, experts being usually in conflict, and the duty devolving on the court and jury of supervising the reasoning of experts being one which can rarely be escaped. It has been said, however, that, when the facts are undisputed, the opinion of an expert can be asked as to the conclusions to be drawn from them, *and as to the conclusions to be drawn from the testimony of a particular witness*, and it is settled that experts of all classes may be asked as to a hypothetical case. But if the facts on which the hypothesis is based fall, the answer falls also. Nor can an expert be asked as to an hypothesis having no foundation in the evidence in the case, or resting in statements made to him by persons out of court." Whart. Cr. Ev., sect. 418.

In *The People* v. *Thurston* we find a number of authorities collated and cited upon this subject, which as there given we reproduce. It is there said : " The general rule laid down by Phillips (1 Ph. on Ev. 290) is : ' The opinion of medical men is evidence as to the state of a patient whom they have seen. Even in cases where they have not seen the patient, but have heard the symptoms and particulars of his case described by other witnesses at the trial, their opinion on the nature of such symptoms has been properly admitted. Thus, on a question of insanity,

medical men have been permitted to form their judgment upon the representations which witnesses upon the trial have given of the conduct, manner, and general appearance exhibited by the patient.' Upon the discussion which took place in the English House of Lords, in 1843, in consequence of the acquittal of McNaughten for the murder of Mr. Drummond, the following question, amongst others, was propounded to the judges in relation to the defence of insanity, viz. : ' Can a medical man conversant with the disease of insanity, who never saw the prisoner previous to the trial, *but who was present during the whole trial and the examination of all the witnesses,* be asked his opinion as to the state of the prisoner's mind at the commission of the alleged offence?' etc. To this question an affirmative answer was given. 47 Eng. Com. Law, 29. The form of the question above given clearly indicates that the medical witness must hear the whole evidence in order to qualify him to give an opinion. So, in *Rex* v. *Serle,* 1 Macl. & R. 75, it was held that a medical man *who had heard the trial* may be asked whether the facts proved show symptoms of insanity. Here, again, the medical witness must have heard the whole of the evidence."

So, in *McNaughten's Case,* 10 Cl. & Fin. 200, it was held that a medical man *who has been present in court and heard* the evidence may be asked whether *the facts stated by the witnesses,* supposing them to be true, show a state of mind incapable of distinguishing between right and wrong. Here, again, it is quite apparent that the witness heard the whole of the evidence tending to prove insanity.

So, in Chitty's Medical Jurisprudence, p. 356, the rule is laid down thus: "The opinion of medical witnesses who have seen the alleged lunatic is unquestionably admissible, and though they have not seen the lunatic, yet their opinion, *after hearing all the evidence,* whether or not a person having so acted and evinced such delusions ought to be deemed a lunatic, it seems, is admissible." The conclusion

is thus summed up : "It would seem to be a just inference from the reason of the rule that the medical witness should be in possession of all those facts tending to prove insanity before he should give an opinion negativing insanity. His opinion on half the facts of the case on which the jury are to decide the cause must be utterly worthless, for it may well be that the same witness, with all the facts before him, would pronounce a very different opinion." *The People* v. *Thurston*, 2 Park. Cr. 134, 135.

In *Lake* v. *The People*, 1 Park. Cr. 557, it is said : "Although the opinions of experts are admissible evidence, yet it must be on a given statement of facts ; and the facts on which the opinion must be admitted must be *all* the facts relied upon to establish the theory which it is supposed these facts sustain. Every witness would otherwise come to a different conclusion, and the same witness, testifying on one-half the facts, might give as his opinion that they indicated sanity, while the other half would satisfy him of the prisoner's madness."

We think the true rule is as summed up in Sharswood's note 1 to p. 27 (9th ed.) of Russell on Crimes : "As to medical experts, they may state their opinion upon the whole evidence, if they have heard it all, or upon a hypothetical statement which is in conformity with the whole evidence." All authorities agree that it is inadmissible to permit an expert to give his opinion upon anything *short of the whole evidence in the case*, whether he has personally heard it or it is stated to him hypothetically. See also Redfield's addition to sect. 5, 3 Greenl. on Ev.

"The proper mode of eliciting this opinion is, in substance, this : Premising that the expert shall have attended the whole trial, and shall have heard *all* the testimony as to the facts and circumstances of the case, and that he is not to judge of the credit of the witnesses or of the truth of the facts testified by others (which are questions for the jury), the proper question is this : 'If the symptoms and

indications testified to by the other witnesses are proved, and if the jury are satisfied of the truth of them, whether in his opinion the party was insane?'" See the editor's note to *Bovard* v. *The State*, 1 Morris' Cr. Cas. 630, with authorities.

We find Dr. Stone's evidence set out in the statement of facts as follows : " Dr. Stone, for defence (expert), testified that he had heard all the testimony in the case, and said that, not being a juror, he asked the court to excuse him from replying to the question whether the testimony established in his mind the sanity or insanity of the accused at the time he killed Foster ; and the court excused him from answering. That he had heard no evidence of the insanity of the accused that could not be explained by other causes, such as indulgence in drink or debauchery. From the evidence of Pool alone, he would not have considered Webb insane. He believed the mind of Webb, at the time the particular offence charged was committed, to have been more or less distracted from some cause, but not to that extent as to relieve him entirely from responsibility."

The witness *had heard all the testimony in the case*, and did not believe defendant insane. This opinion, founded upon the whole testimony, must have included, and did include, the evidence of the witness Pool. If it did, then how could any injury result to defendant by asking — and that, too, upon cross-examination — the opinion of the witness upon the testimony of Pool alone? We confess we cannot conceive. It would have been otherwise if the expert had not heard and formed his opinion upon the whole case, for in that case the question and answer would have been not only improper, but illegal and inadmissible.

One of the grounds of the motion for new trial was that defendant was misled and taken by surprise at the testimony of Dr. Stone ; because, after all the testimony of the witnesses who were examined was heard, defendant's counsel withdrew with the experts, Dr. Stone amongst them, to

ascertain their views on the question of sanity from this evidence, and whether there was occasion to introduce other evidence which they had on the subject, and that, Dr. Stone, with the others, expressing himself satisfied from the evidence adduced that defendant was insane, they did not introduce such other testimony. This ground of the motion is supported by affidavits. The court did not err in overruling this ground of the motion. It is not shown that any application was made to the court for permission to introduce these witnesses after Dr. Stone had testified, which could and would have been permitted by the court in case it had been made to appear that it was necessary to the due administration of justice. Code Cr. Proc., art. 661. Nor is the motion strengthened by the allegation that upon a new trial the defendant will be able to procure other eminent scientific medical experts whose opinions upon the evidence will be different from that of Dr. Stone. Being surprised at the testimony of his own witness, defendant should have invoked the aid of the statute, which provides that " a continuance may be granted on the application of the State or defendant, after the trial has commenced, when it is made to appear to the satisfaction of the court that, by some unexpected occurrence since the trial commenced, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had ; or the trial may be postponed to a subsequent day of the term." Id., art. 568. " Surprise is not one of the grounds for a new trial in felony cases, all of which grounds are prescribed by the statute." Id., art. 777 ; *Walker* v. *The State*, 7 Texas Ct. App. 262 ; *Higginbotham* v. *The State*, 3 Texas Ct. App. 447.

The most formidable question in the case under consideration grows out of the refusal of the court to give in charge to the jury a special instruction requested, as follows : "That, if the jury entertain a reasonable doubt of the sanity of the accused at the time he shot Charles Foster, they

should acquit him." Upon the issues of sanity and insanity the general charge given followed almost literally the law as enunciated in *Webb* v. *The State*, 5 Texas Ct. App. 596, and which was but a reproduction of the doctrine upon that subject as declared in 2 Greenleaf on Evidence, sects. 372, 373. After making an appropriate application of these rules of law to the facts, the jury were further charged : " It is your province to determine, from all the evidence in the case, whether the defendant was sane or insane. Every defendant in a criminal case is presumed to be innocent until his guilt is established by legal evidence, beyond any reasonable doubt, and in case of a reasonable doubt as to his guilt he is entitled to be acquitted. Therefore, if you have any reasonable doubt of the guilt of the defendant, under the evidence in the case and the law as herein given you, you will acquit him." Here it will be seen that the court had charged the reasonable doubt fully with regard to the whole case made by the evidence. Was the defendant entitled to, and was it incumbent upon the court to further charge, in addition, the reasonable doubt specially with regard to the issue of his sanity ?

In this State this question has never heretofore, so far as we are aware, been directly adjudicated. If we look to the English decisions, or the decisions of the other State courts, we find much contrariety of opinion upon the subject : some courts holding that the burden of proving his insanity rests upon the defendant who interposes it, and that he is in duty bound to establish it as an independent fact, beyond all reasonable doubt ; others hold that the fact must be established by defendant, but need only be shown by a preponderance of evidence, as in civil cases, sufficient to overcome the presumption of sanity, and not necessarily to the exclusion of the reasonable doubt ; whilst others again — and these may be classed as of the modern, or progressive school — insist that, inasmuch as the burden of proof never shifts from the State in any criminal case, but rests upon

her to establish every element necessary to constitute the crime alleged, and inasmuch as the question of a defendant's sanity enters into and tends to controvert the most important constituent of crime,—to wit, the criminal intent,— that therefore the State must affirmatively establish the fact of sanity beyond a reasonable doubt. Those curious to investigate these different theories, and the grounds upon which they rest, will find the authorities collated and discussed in *Bovard* v. *The State*, and the editor's notes to the case (1 Morris' Cr. Cas. 818), and in 2 Bishop's Criminal Procedure (3d ed.), sects. 669 to 673, inclusive. Whart. Cr. Ev. (8th ed.), sect. 335 *et seq.*

Our own State, in the plenitude of her mercy and humanity, following the generous dictates of all human and divine law, declares that " no act done in a state of insanity can be punished as an offence " (Penal Code, art. 39), and in the definition of murder provides that it must be the act of one " of sound memory and discretion." These two principles are, however, subordinate to another, which is a postulate in estimating all human action from a legal stand-point, and that is that every man is presumed to be sane until the contrary is made to appear. This presumption of sanity is one of the maxims of the law. To such an extent is it indulged, even in cases of murder, that " the indictment makes no mention that the accused is of sound mind, even when drawn on a statute which has the words ' of sound memory and discretion.' For, though sanity is essential to crime, it is sufficiently charged in the allegation of the criminal act, being the *prima facie* condition of mankind." 2 Bishop's Cr. Proc. (3d ed.), sect. 669. And so also " the authorities agree, and properly, that in some way the presumption of sanity attends the proven acts of the prisoner, operating with sufficient force to create against him a *prima facie* case." Id., sect. 672. Such a case is more than a *prima facie:* it is a positive case.

To us it appears needless to dispute as to how or in what manner this presumption is to be rebutted and overcome. It is self-evident that if no issue at all of sanity is raised by the evidence introduced by the State, nor by that produced in behalf of the defendant, then the positive case (*prima facie*, as it is called by Mr. Bishop) established by the State should and will rightfully carry conviction with it by virtue of the presumption. But if, beyond this presumption of sanity, — if beyond the positive, not alone *prima facie*, case attending the proven acts constituting the crime, — it still devolves upon the State to show affirmatively the existence of sanity beyond a reasonable doubt, then it seems to us that it necessarily follows that this proof must be made in all cases, irrespective of whether the issue grows out of the evidence or not, and consequently that the virtue of the presumption becomes a delusion, and a *prima facie* case without this proof an utter impossibility. The folly of such an argument is its own most appropriate answer.

Suppose, however, that the sanity of the defendant does become a question, — whether from the evidence of the State or that adduced by the defendant, — should the State show the sanity or the defendant the insanity beyond a reasonable doubt? Admit, for the sake of the argument, that the duty devolves upon the State; how is the judge to charge fully the law applicable to the subject? In terse, plain, and comprehensive terms he could not, perhaps, better express it than in the following language, viz. : "The law presumes every man to be sane until his sanity is established beyond a reasonable doubt." This, it may be said, is an absurdity. Grant it, and yet the absurdity will rest where it properly belongs, with those maintaining the proposition that the State shall prove sanity beyond a reasonable doubt.

We do not deem it necessary or incumbent upon us to unravel or attempt to answer the misty mazes and the metaphysical disquisitions indulged in by the opposing theorists about sanity being essential to criminal intent, and criminal

intent being essential to punishable crime, nor their equally abstruse and obscure views as to which side has the burden of proof when the sanity of the defendant, from whatever cause, acquires a *status* in the case. The attempt would be as useless as profitless, in our view of the question. We are free to admit that the defendant is not bound to plead his insanity specially, nor that he may not show it under "a plea of not guilty." Still, this does not settle it that the burden of proof is either on the State or the defendant. Until the Legislature definitely declares a rule, the question will still, perhaps, remain in doubt as to where the burden of proof rests. We think it is unnecessary that we should determine it. Oftentimes it occurs in law, as in ordinary human transactions, that between opposing theories and opinions there is a middle ground, which, once attained, will lead to safe and satisfactory results. "*In medio tutissimus ibis.*" And so, in our opinion, in regard to this question of sanity in criminal cases. Mr. Bishop states this middle ground. He says: "The doctrine of principle, sustained by a large part of our courts and rapidly becoming general, is that, as the pleadings inform us, insanity is not an issue by itself, to be passed on separately from the other issues, but, like any other matter in rebuttal, it is involved in the plea of not guilty, upon which the burden of proof is on the prosecuting power: the jury to convict or not, according as, on the whole showing, they are satisfied or not, beyond a reasonable doubt, of the defendant's guilt." 2 Bishop's Cr. Proc., sect. 673. And Mr. Wharton says: "At the same time, if the defence goes to negative malice, and malice is an essential part of the case of the prosecution, then, if on the whole evidence there be a reasonable doubt as to malice, there should be an acquittal." Whart. Cr. Ev., sect. 335.

It is a noticeable fact that those who insist that the doctrine of reasonable doubt applies to the question of sanity, because insanity is an attack upon the integrity of the

criminal intent which the State is always bound to show affirmatively, are also forced into the position that it is not a distinct substantive issue upon which the defendant has the burden of proof. In other words, they claim that it is a part and parcel of the whole case made by the State; one which she is bound to establish beyond a reasonable doubt, and one which, when she has established it on the whole case beyond a reasonable doubt, is not sufficient, because she has not established it beyond a reasonable doubt when applied to the question of sanity separately and alone. The inconsistency is in giving to a part a prominence sufficient to defeat the whole of which it is but a part, and in insisting that a part shall control the whole, instead of being only considered with and included in it. It will not do to say that the reasonable doubt, independent of the whole case, applies and must be given to each and every element going to make up the *corpus* of the crime, and, failing to do so, that the charge would be insufficient; because such a rule would lead to unnecessary and perhaps interminable confusion, and in a case of circumstantial evidence, for instance, it would be necessary to charge it with reference to each isolated fact in a chain of facts essential to the existence of the main fact. No one, we suppose, will contend that this is requisite. Speaking of the defence of an *alibi*, in the case of *Walker* v. *The State*, Chief Justice Roberts says: "It is not a defence at all, in any other sense than as rebutting evidence tending to disprove the fact alleged in the indictment, that Walker killed Butler, the burden of proving which allegation rests on the State throughout the whole trial." And again: "The rule of law is that such evidence of an *alibi* should only be of such weight as to produce upon the minds of the jury a reasonable doubt of the fact affirmed by the State, that Walker was the man who shot Butler." 42 Texas, 360. In the case at bar, the evidence of insanity was no defence, save as it tended to rebut or destroy the criminal intent with which Webb shot

and killed Foster, and it should only be given such weight as would produce upon the minds of the jury a reasonable doubt, not of Webb's sanity, but of the fact affirmed by the State, which was that Webb killed Foster with criminal intent, and under circumstances constituting the crime murder.

In a general view of the case, we think that, no matter upon whom the burden rests or how the proof is adduced, the evidence of insanity, to warrant an acquittal, should be sufficiently clear to convince the minds and consciences of the jury; because the law requires that, " when the defendant is acquitted upon the ground of insanity, the jury shall so state in their verdict." Code Cr. Proc., art. 722.

Our conclusion of the whole matter is that the charge of the court was a sufficient exposition of the law of insanity, and that, having fully charged the law of reasonable doubt as to the whole case, the court did not err in refusing the special requested instruction.

We have been unable to see any error in the proceedings had on the trial which requires a reversal of the case, and the judgment is therefore affirmed.

*Affirmed.*

HURT, J., dissents upon the proposition that no error was committed in refusing the special instruction, and refers to his view in the case of *Levi King* v. *The State*, decided at the present term, *post*.